451 So.2d 1082 (1983)
Vincent BRUNO
v.
DEPARTMENT OF POLICE.
No. 12506.
Court of Appeal of Louisiana, Fourth Circuit.
June 29, 1983.
On Rehearing June 6, 1984.
Frank J. Larré, David K. Joyce, Jefferson, John H. Brooks, Gretna, for plaintiff-appellant.
*1083 Charles J. Willoughby, Asst. City Atty., Salvador Anzelmo, City Atty., New Orleans, Grant E. Morris, Washington, D.C., Bruce E. Naccari, Asst. City Atty., Bernette J. Johnson, Galen S. Brown, Deputy City Attys., New Orleans, for defendant-appellee.
Before GARRISON, AUGUSTINE and WARD, JJ.
AUGUSTINE, Judge.
On March 14, 1980, Officer Vincent J. Bruno was dismissed from the New Orleans Police Department for having violated departmental regulations governing the conduct of police officers while on sick leave. Bruno appealed his dismissal to the Civil Service Commission of the City of New Orleans and, following lengthy trial, the Commission affirmed, finding just cause for Bruno's termination. By this appeal, Vincent Bruno seeks reversal of the Commission's findings.

I
From the outset, it is critical to define clearly and objectively the true bounds of this controversy, for there can be no denial that long before the events which directly concern us today, these disputants had become embroiled in a bitter political conflict whose direct result was the policeman's strike and ensuing cancellation of Mardi Gras in February of 1979. Officer Bruno, it will be recalled, was the leader of the striking union, the Policeman's Association of New Orleans (P.A.N.O.), and it was he who suffered the wrath of many of our citizenry and city officials in whose minds Bruno caused the ruin of "the greatest free show on earth." But such consequences cannot deter us from our proper object, which is to separate that which is truly at issue from that which is not. Any objective inquiry concerning the propriety and legality of Bruno's dismissal must therefore begin with this simple question, and no other:
Did Officer Bruno violate New Orleans Police Department regulations governing conduct while on sick leave?

II

The Regulations
The specific regulations said to have been breached by Officer Bruno are:[1]
1) Departmental Regulation 630-3, par. 3"An employee on sick leave shall not leave his residence or other authorized location of confinement prior to returning to duty from sick leave, except as provided herein."
2) D.R. 630-3, par. 4. "Employees who must visit personal physicians during periods of sick leave shall notify their unit accordingly ..."
3) D.R. 630-3, par. 6. "When it is necessary for an employee to leave his place of confinement to purchase medicines or meals not available at his place of confinement, notification shall be made to the employee's Unit or the Command Desk ..."
4) D.R. 630-3, par. 9. "Employees on extended sick leave, for an illness or any injury, may arrange for advance approval from the Medical Section for activities related to continued treatment, convalescence and rehabilitation so that notification of each instances (sic) of leaving the place of confinement will not be necessary."
On October 25, 1978, D.R. 630-3, paragraph 9, supra, was modified to insure that
"an employee who has permission from his attending physician to leave his place of confinement shall secure departmental permission through the chain of command from the Superintendent or Deputy Superintendent of Police. Such request must be secured prior to the employee actually leaving his place of confinement."[2]
*1084 The above regulations were again amended on November 4, 1979about two weeks after Bruno's sick leave beganby ASOP 75.0, a series of regulations which included the following:
"2.... A member of sick leave shall remain in his residence or other approved place of confinement for the entire sick leave period, except to visit a physician, hospital, clinic, purchase meals or purchase medicine. The member shall notify his Unit of assignment before leaving and upon returning from such a visit... (Emphasis added).

III

The Undisputed Facts
The following conduct on the part of the appellant is undisputed:
1) October 21, 1979At his request, appellant was placed on sick leave because of an ear infection. Bruno listed his place of confinement as Norgate, New Jersey.
2) October 22, 1979The day after being placed on sick leave, Officer Bruno travelled to Ventnor, New Jersey.
3) November 24, 1979Appellant travelled to Detroit, Michigan, where for three days, he engaged in activities related to his position as leader of PANO. From Detroit, Bruno travelled to Washington, D.C., and Miami, where he again conducted union activities.
4) November 30, 1979Sergeant Clogher and Sergeant Taylor placed a telephone call to the appellant at his residence, but received no answer. Bruno admitted that he was not home at the time, and explained that earlier, he had called Urban Squad (appellant's regular unit) to report his intention to keep an appointment with his doctor, but that the line was busy.
5) December 13, 1979Vincent Bruno participated as a judge in a talent contest held at a Fat City nightclub.
6) December 28, 1979Appellant was interviewed by reporters at the studios of television station WWL.
7) January 6, 1980Officer Bruno failed to appear at a scheduled conference with Sergeant Liniel W. Thompson. Bruno explained his absence as due to lack of communication about the time and place of the meeting.
8) January 12, 1980Bruno met the City's Chief Administrative Officer, Reynard J. Rochon, at a downtown hotel to discuss Bruno's union activities and the apparent impropriety of conducting such activities while on sick leave.
9) January 16, 1980Officer Bruno was interviewed by news reporters for WWL, away from his place of confinement.
10) January 22, 1980Officer Bruno addressed a Mardi Gras organization, the Krewe of Endymion, at a mid-city hotel.
11) January 23, 1980Officer Bruno left his place of confinement to attend a PANO meeting at the Carpenter's Hall, 315 South Broad Street, New Orleans.
12) January 31, 1980Officer Bruno attended a fund raiser for President Carter at a downtown hotel.
13) February 5, 1980Officer Bruno attended a PANO meeting, away from his place of confinement.
14) February 29, 1980Officer Bruno was interviewed at the WDSU television studio in New Orleans' French Quarter.
15) Sometime between March 1 and March 14, 1980Bruno travelled to New York and Philadelphia to conduct union activity. Bruno freely admitted having made this trip, but could not specify the date, recalling only that the trip was some time in March 1980, prior to his dismissal.
16) March 10, 1980Officer Bruno appeared on a radio talk show.
17) March 14, 1980Appellant is dismissed from the New Orleans Police Department. That same day, Bruno departed for Cincinnati, but it cannot be known from the record whether Bruno's travel arrangements had already been made as of the time he received notice of termination, nor is it clear whether Bruno received the letter before departing.
*1085 The City's chief contention is that each of Bruno's above-cited departures from his place of confinement was without authority and without notice to his superiors, and therefore contrary to departmental regulations. We acknowledge the merit of the City's position.
To reiterate, Officer Bruno readily concedes each of the above-cited departures from his place of confinement. It must be borne in mind that under the regulations, when an officer departs his place of confinement for any purpose other than to purchase meals or medicine, or to visit a physician, mere notification of departure to the officer's unit or command desk is not sufficient. Such activities as judging a talent contest or addressing a Mardi Gras Krewe plainly require "departmental permission through the chain of command from Superintendent or Deputy Superintendent of Police". D.R. 630-3, par. 9, (as modified) supra. (Emphasis added). The evidence clearly shows that no such permission was ever sought or granted.
Had Officer Bruno sought permission to conduct his varied activities, regulations required that he initiate arrangements with the first link in his chain of command, his commanding officer, Rinal Martin. When called as a witness before the Commission, Lt. Martin unequivocally stated that at no time did Bruno obtain permission to travel to Detroit, Philadelphia, New York, etc., or to judge a talent contest, or to conduct interviews away from his place of confinement. Indeed, Bruno did not even notify Lt. Martin or any other superior officer of his intention to conduct such activities. It follows that Bruno was in clear violation of departmental regulations.
As we have already pointed out, appellant was fully aware of the impropriety of his conduct, for that was a principal topic of his discussion with the City's Chief Administrative Officer, Reynard Rochon, on January 12, 1980. The purpose of the meeting was to reconcile Bruno's commitments to the union with his commitments as a police officer. It thus appears to us that inasmuch as the meeting was at Bruno's instance, he earnestly sought to avoid confrontation with the City and the Superintendent of Police, James C. Parsons.
Bruno could not reconcile his union activities with his duties as a police officer, however, unless he were placed on extended furlough, and thus be released from the sick leave regulations. Confrontation became inevitable, then, when Bruno's requests for extended furlough were denied, first, by Lt. Martin, and later by the Deputy Chief of Police David Kent.
At the hearing of this matter, Kent testified that on January 20, 1980, he informed Bruno that he could not be carried on furlough because, as Kent expressed it:
"His professional obligation (was) to return to a full duty status. By that I meant to working status, at which time he could then make petition or request to be carried on annual leave."
During that same conversation, Kent told Bruno that it would constitute a violation of departmental policy to be away from his place of confinement without prior approval. Kent accompanied his warning with the observation that given Bruno's high degree of visibility, such conduct while on sick leave jeopardized not only Bruno's public image but the department's as well. This appeal to Bruno's sense of duty and propriety, however, went unheededtwo days later, Bruno addressed the annual gathering of the Krewe of Endymion.
Further testimony from Bruno's chain of command was offered by Superintendent of Police, James Parsons, who categorically denied having given Bruno permission to change his place of confinement from Norgate, N.J. to Ventnor, or New York, or Philadelphia, or Cincinnati, or Miami, and denied giving Bruno authority to engage in any of the activities in question. Finally, with respect to the critical question whether Bruno had ever received permission, Bruno himself admitted to the Internal Affairs Division on March 7, 1980 that he could not recall having even notified any officer of his intention to depart his place of confinement. Although Bruno later retracted *1086 that statement before the Commission, explaining that at the time of the statement, he was under the influence of Valium, the Commission was warranted in disregarding his recantation, for several witnesses to his condition at the time testified that he was coherent and in full control of his faculties. Moreover, not a single desk officer was able to verify that Bruno had called to notify of his departures to secure medicines, meals, and so on, as required by D.R. 630-3, par. 6, supra.
But that is not the focus of our concern. For Bruno to seek vindication on the premise that he notified his desk officer is to inject a bogus defense, for as we have stated, mere notification of that sort cannot serve as the sufficient requisite to the types of activities which Officer Bruno conducted. Regulations required that he first obtain permission through the chain of command, and it is clear that this was not done.
Appellant argues that even if it be proved that his conduct violated the regulations in an objective sense, he should nevertheless be excused for lack of knowledge of those rules. He claims subjective innocence.
That defense is untenable. It is inconceivable to us that a police officer of Bruno's experience could hopscotch from one state to another on personal business, conduct radio and television interviews, judge a nightclub talent show, and address a Mardi Gras krewe without knowing that he was, in the process, running afoul of sick leave regulations.
In any event, the City does not merely posit Bruno's constructive notice of regulations. During Bruno's hearing before the Internal Affairs Division on March 7, 1980 wherein the appellant informed his superiors for the first time that the illness which required his absence from duty was no longer an ear infection, but a heart conditionBruno was ordered to undergo an immediate physical examination which was completed that same afternoon by physicians at the Tulane University School of Medicine. The examining doctors found nothing which might impede appellant's job performance, whereupon Chief Parsons personally ordered Bruno to return to duty. Bruno defied that order by appearing on a radio talk show during working hours only three days later. Immediately after the broadcast, Bruno was called at the radio station by his commanding officer, Lt. Martin, who reiterated Chief Parson's order to return to duty. On his way home from the station, Bruno called Lt. Martin to advise that he (the appellant) had just then suffered a heart seizure. Lt. Martin then withdrew the order to return to work, but reminded Bruno that only a few days before, he had been found fit for duty by a qualified physician.
It is obvious to us that in the eyes of Superintendent Parsons and Chief Deputy Kent, Bruno's post-examination behavior was the proverbial straw that broke the camel's back. Four days after Bruno's talk show interview, Chief Parsons drafted Bruno's letter of dismissal.
We thus proceed to answer the first question, and hold that since it has been amply demonstrated that Officer Bruno did not on any occasion obtain permission from the chain of command to leave his place of confinement, it necessarily follows that in every instance cited, the appellant knowingly and intentionally violated N.O.P.D. sick leave regulations.

IV

The Dismissal
The only remaining question is whether Bruno's violations were so serious as to warrant his dismissal. We hold that they were.
In determining whether an employee should be dismissed for off duty misconduct, the test is whether there is a real and substantial relation between the conduct of the employee and the efficient operation of the public service. Leggett v. Northwestern State College, 242 La. 927, 140 So.2d 5, 9 (La.1962).
*1087 As we apply the above test, it cannot escape our knowledge that Officer Bruno's outright defiance of departmental authority is impressive by its sheer frequency and duration. Over the course of five full months, from October 1979 until March 1980, the appellant committed no less than fifteen separate violations of sick leave policy. In each instance, Bruno flouted a regulation whose reasonableness should be apparent to anyone even vaguely aware of the need for discipline within a large urban police department. Indeed, the principle upon which the regulation is based is so self-evident as to dispense with explanation. True, the police department did not formally contest Bruno's assertion that he had been ill throughout the period in question, but any employer would rightly feel betrayed upon witnessing the prolonged breach of trust evidenced here. Officer Bruno's employer was the City, or more correctly, the taxpaying public, who must have considered themselves betrayed upon learning that Officer Bruno received pay their tax dollarsduring his absence from duty. It is natural that appellant's conduct should engender among the people a generalized contempt for our entire system of law enforcement. Such destructive consequences are intolerable to a well ordered police department, whose character must remain beyond public reproach, and it cannot be proposed that Officer Bruno's status as a once highly visible union leader confers any immunity not enjoyed by his fellow officers. The misconduct which spawned these consequences demands the most emphatic rejection.
There may be those who believe, as my dissenting brother does, that Officer Bruno was a purely political casualty. But it cannot matter that the appellant's chief adversaries were the Superintendent of Police and the City Administration, unless it be clearly proved on the record that the dismissal was motivated principally by revenge and vindictiveness. The record before us is empty of such proof, and indeed appellant himself does not seek reversal on those grounds.[3]
Moreover, it cannot seriously be contended that Officer Bruno was singled out for discriminatory treatment. We are convinced that had any officer of the New Orleans Police Department conducted himself as Officer Bruno did, he would have been dismissed from his duties. The proof of this is that in 1977, Officer James M. Willem received a ninety day suspension for violating the same regulations. We upheld that penalty on appeal, even though Willem's single transgression was to appear at a bar without reporting to authorities. See Willem v. City of New Orleans Dept. of Police, 368 So.2d 1235 (La.App. 4th Cir.1979). Similarly, in Timmons v. Municipal Fire & Police Civil Service Board, 395 So.2d 1372 (La.App. 1st Cir. 1981), the Court affirmed the dismissal of a police officer who was discovered in a bar while on sick leave. There, it was said that:
"A police departmental order prohibiting an officer on sick leave from drinking in a bar or lounge bears a real and substantial relationship to the appropriate governmental objective of maintaining public confidence in the police force. The departmental order bears a reasonable relation to the goal sought to be attained by the police department, i.e., integrity and confidence in the police force, and the order was adopted in the *1088 interest of the community as a whole. Everett v. Goldman, 359 So.2d 1256 (La. 1978). It is clearly a valid objective of the police department to prevent off duty sick police officers from frequenting barrooms. Public confidence in the police force could be severely undermined if police officers who were allegedly sick were allowed to continue to frequent bars and lounges. Timmons, supra, at 1376. (Emphasis added).
In conclusion, we hold that there was a real and substantial relation between the conduct of Officer Bruno and the efficient operation of the New Orleans Police Department, and that the dismissal was neither arbitrary nor discriminatory, but founded upon good cause.
For the reasons assigned, the findings of the Civil Service Commission are hereby affirmed.
AFFIRMED.
GARRISON, J., dissents with reasons.
GARRISON, Judge, dissenting.

I

The Man Who Stole Mardi Gras
"And yet you continued to be actively engaged in union activities, you went out of town on at least three occasions, to Detroit, New York and Florida on union business, and you attended at least two union meetings and you spoke to the Krewe of Endymion concerning possible police action ..."[1]
This case appears to me to involve the officially sponsored railroading of a veteran police officer of many years' service. It grows out of a classic union-busting effort of a kind rarely seen in present day city administrations. At another level, the case addresses itself to the elaborate use of the machinery of justice to accomplish injustice.
Specifically, the case concerns the dismissal of Officer Vincent Bruno supposedly for violation of "police department sick leave regulations." Officer Bruno had thirteen years of service and was well on his way towards earning a sixteen-year retirementthat lure which was established during the postwar years to bring into the police department men who otherwise might not have joined.
Ordinarily, the fact that an officer had many years of service, and was close to earning his pension, would be cause for some consideration prior to any action against him for an alleged infraction of minor regulations. But this was not the case with regard to Officer Bruno. He was the man whoor so some apparently thoughtstole Mardi Gras. He was the Grinch who stole Christmas.
For Officer Bruno was the leader of the police union when it struck against the City of New Orleans. As the result of this police strike Mardi Gras was cancelled for the first time since World War II.[2]
From the announced circumstances of Bruno's firing for violation of "sick regulations" by Police Superintendent Parsons, a casual observer might think that little notice had been taken of his police union activities, of the police strike which he led against the City and of the subsequent cancellation of Mardi Gras. A review of this case, however, leaves no doubt that the real reason for the dismissal of Officer Bruno was his activity as the union leader of the police strike and the closing down of Mardi Gras which followed. One additional factor, the joinder of his union with the national AFL-CIO quite apparently determined his actual date of dismissal because he was fired the very next day (see page 1095 hereunder). The allegation that Bruno was fired for violation of any kind of regulation whatsoever, as will be seen, is sheer artifice and a distinct fraud upon our legal system.
*1089 The particular union of which Vincent Bruno was the headand which he was leading at the time of the police strike against the Citywas the Police Association of New Orleans (PANO). The cancellation of Mardi Gras by the City administration fell on February 27, 1979.
It is rather hard not to notice that in March, 1979, the City Finance Officer informed that union, among other organizations, that the City was going to end its practice of taking out payroll deductions, requested by City employees, in the union's behalf. It was announced that these deductions, known as "check-offs", were being stopped by the City because of a reduced budget. This action, had it been successful, could have created an overnight survival problem for the police union, not to mention the others.
The City administration's effort to stop payroll deductions from going to the police union and other associations soon enough was in the courts, where ultimately it was blocked. But, as the record in the instant case shows, the City's investigation of Officer Bruno was underway by November of 1979, and the results of that Alphonse and Gaston tableau are now before us.
All of this was in the name of good government, of course. The check-offs for the police union were to be terminatednot because the union had struck against the City at Mardi Gras, but ostensibly because the administration was concerned about budget problems. The thirteen-year police career of the union leader was to be terminatednot because he had led the police union's strike against the City, but ostensibly because he had problems with his sick leave. Or so it was all publicly explained by administration spokesmen.
However, I cannot blind myself to the true circumstances in which the City, after having attempted to discipline the police union, managed to catch its leader by the heels. When the royal elephant is found missing and the power elite charges its selected suspect with dropping cracker crumbs on the floor, are we really supposed to believe that the local government is frenzied by cracker crumbs on the carpet?
It is plain that the City sought to dispose of the problem of the pesky police union officer by resorting to the cunning and deceitful use of law enforcement machinerya project in which it succeeded more than I would have thought possible. It is also plainfrom the enthusiasm with which they joined in the chasethat once the hunt was underway the pursuers did not lack for official allies in cornering the union leader. A few may have felt unhappy about the cancellation of Mardi Gras and a few others may have felt unhappy about unions, but they seem to have put aside their personal feelings out of their common devotion to the Police Department's sick leave regulations. Surely, they must have reasoned, a small public hanging might not be out of order for the man who stole Mardi Gras.
The writer, Kafka, makes the point that sometimes those in power are not overly concerned about the existence of actual guilt so long as the proper law enforcement procedures are followed.[3] In any case, the official phalanx rolled smoothly against the leader of the police union. The Police Department finished its part of the case when Superintendent Parsons charged Officer Bruno with violating sick leave regulations (and then, in the same breath, found him guilty).[4] The City Attorney's Office adroitly explained how the top command of the Police Department had managed to crack the case: "During Mr. Bruno's absence from work his superiors suspected that Mr. *1090 Bruno was possibly in violation of sick leave regulations."[5]
One can almost sense the impatience with Officer Bruno's plea of innocence at the Civil Service Commission hearing. "... (Bruno) contends that he didn't know of the 1978 sick rule change," an assistant city attorney argued. "Surely, Mr. Bruno, a police officer with thirteen years experience, knows it's his obligation to keep current with the department's rules."[6]
When the government acts ignobly it injures not only the individual who has become its prey. It hurts our system of laws as well. Many people observe what is actually happening and, not fooled by the attendant protocol and rote of a particular travesty which may be unfolding before them, lose confidence in the entire machinery of justice.
To allow a law enforcement authority to switch a charge to a more convenient accusation is tantamount to encouraging that authority to select the convenient charge at the outset and find the evidence later. It is all very well for the Queen to announce "Sentence firstverdict afterwards,"[7] but in New Orleans the Superintendent of Police cannot do that and neither can the City Administration.
The charges initiated against Officer Bruno plainly were arbitrary, capricious, discriminatory and contrived. In my regard, the majority of this panelinstead of lending credence to such mendacity should have concluded that it was error for the Civil Service Commission to uphold such obviously false charges.

II

Freedom of Speech
"No law shall ever be passed to curtail or restrain the liberty of speech or of the press; any person may speak, write or publish his sentiments on all subjects, being responsible for the abuse of that liberty."[8]
The circumstances of the "sick leave violation" charges against Officer Bruno indicate perception that any earlier charges related to his leadership of the police strike might encounter First Amendment problems. Waiting for a distinct time interval, then charging him with an alleged offense off to the side of the picture, clearly was the chosen solution. Thus it came to pass that, some months after the Mardi Gras strike had subsided, Bruno "ran afoul of sick leave regulations."[9] Nevertheless, like Wile E. Coyote having another one of his inventions blow up in his face, Officer Bruno's superiors appear to have run afoul of the First Amendment.
Both the United States and Louisiana Constitutions forbid government actions which have the effect of denying freedom of speech to any individual.[10] I believe that this factor alone should act as a bar to maintaining Officer Bruno's conviction.
Superintendent Parsons' letter to Officer Bruno informed him that he was being terminated for violations which included engaging in the following actions without permission:
"... On December 28, 1979, you were interviewed at the WWL Studios located at 1024 North Rampart, New Orleans, *1091 Louisiana, by I.J. Hudson." (Emphasis supplied).
"... On January 16, 1980, you were interviewed by Sally Ann Roberts of WWL-TV away from your place of confinement." (Emphasis supplied).
"... On January 22, 1980, you addressed the Krewe of Endymion at the Fountain Bay Hotel located at 4040 Tulane Avenue, New Orleans, Louisiana." (Emphasis supplied).
"... On February 29, 1980, you were interviewed at WDSU Studio at 520 Royal Street, New Orleans, Louisiana." (Emphasis supplied).
"... On March 10, 1980, you were a guest on a radio talk show for approximately three hours at WSMB Radio Station located at the Maison Blanche Building at 901 Canal Street, New Orleans, Louisiana." (Emphasis supplied).[11]
The single common factor in each of these charges was Officer Bruno's exercise of the right of free speech. Yet a major part of Bruno's job as leader of the police union involved communication by him not only to fellow police officers but to the public at large. Such systematic conversion of the interchange of ideas into "violations" of departmental regulations could have a chilling effect on future union leaders or on others similarly placed. Superintendent Parsons acted improperly in this regard and the Civil Service Commission committed error in upholding his action.
III
The Police Department's Case
Mr. Martin: How religiously is this book kept?
Sgt. Thompson: I don't know, personally.
Q: You don't keep it up?
A: No sir, I don't.
Q: Who does?
A: It's the responsibility of the desk officer.
Q: And who does the desk officer work for?
A: He works for the platoon commander.
Q: Which is you?
A: Which is myself.
Q: But you don't know whether it's really kept up religiously or not?
A: No.[12]
Even under the Department's official fiction that "sick leave violations" constituted the gravamen of Bruno's offense, its case at the Civil Service Commission hearings must be regarded as a prosecutorial disaster. Put in terms of a missile launching, it would be fair to say that the missile fell over on the launching pad.
Evidently the attorneys representing the police force assumed that they could show the justification for Superintendent Parsons' dismissal of Officer Bruno by calling the officer as their main witness. However, as some prosecutors might have explained to them in advance, Bruno's testimony was very destructive to the police department's case. It showed, at the outset, that a gulf had developed between Officer Bruno and the police force concerning the interpretation of the key sick regulations involved. It showed, further, that the police department had made no serious effort to straighten out this communication problem (which plainly developed after the Mardi Gras strike, inasmuch as Bruno had had health problems for many years while on the force with no sick leave problems of any kind arising).
The testimony demonstrated clearly that the police department's control of procedures maintaining a sick leave log book for checking in and checking out of one's residence ranged from catastrophic to nothing at all. For example, the appellant was asked if he had acted as a judge at a talent contest at Frankie Brent's Lounge in Metairie and he replied in the affirmative. Then, somewhat representative of the entire *1092 questioning (this constituting the major part of the City's case), the colloquy developed along the following lines:
Q: You know whether or not you left to attend this contest without notifying the Department?
A: I called the Urban Squad and told them I was going to the address 4724 Utica Street.
Q: You recall who you talked to at that time?
A: No.
Q: But that should be in the sick leave book that's maintained?
A: I didn't know that there was a sick leave log book. I never heard of one.
Q: When someone called you when you were working, to report that they were leaving their home to go to the doctor or the clinic or something (sic), what would you do? How would you handle that?
A: Write it on a piece of paper and when they called back, throw the piece of paper away.
Q: You never forwarded that information to any of your prosecutors?
A: Never was advised to. I wasn't even aware that there was a log at the Urban Squad or any other Division.[13]
Again, in addition to this representative sample of the absence of support for the sick leave charges he was asked whether he had checked in with the Urban Squad before departing for Detroit (on union business). His answer was: "Well, that's not entirely correct. I notified the Urban Squad office."[14] Asked whether he had given notification before leaving to speak to the Krewe of Endymion at the Fountain Bay hotel, he replied in the affirmative, particularizing that he had talked to the Deputy Chief before he left.[15] Asked if he had given notification before leaving for a PANO meeting in January[16] and before leaving for a fund raising affair for President Carter[17] his answer continued to indicate that he had.
Asked whether he had given notification before leaving to speak at a February PANO meeting at 315 South Broad Street, he again responded affirmatively.[18] Here, incidentally, he was asked whether he had given a news conference at PANO, and he replied that he had.[19] Bruno's allowing of news coverage makes apparent the fact that his allegedly incriminating activity was entirely open and aboveboard.
At no time in Officer Bruno's career, the testimony showed, had he been cautioned, warned or disciplined regarding sick leave abuse until shortly before his termination. At no time during Officer Bruno's illness did any person from the Department of Police inform or caution him regarding his methods of reporting departures from and returns to his place of confinement.
The Department of Police failed to establish that Officer Bruno at any time was advised either verbally or in writing that he was abusing the Department's sick leave policy. Officer Bruno testified, and other testimony corroborated, that he had sought to work out his physical and psychological problems in such a way that he would not be breaking Department rules nor interfering with the orderly functioning of the Department. Indeed, the record makes it notably clear that heand not the Departmentwas the sole protagonist in that effort.
Even though these examples of deteriorating charges were selected at random, they show how the police department's case died aborning. And that's the way it went with regard to the effort to show that Officer Bruno systematically failed to inform *1093 the Urban Squad before he went somewhere. In instance after instance, the testimony showed that either he had notified the squad or the records could not be found.

The Drones Club
The New Orleans Police Department is generally represented, and justifiably so it would appear, as one of the better police departments in the country. In recent years the law enforcement record with regard to crimes of high priority has been good.
However, the portions of the transcript just referred to make it plain that the dissemination of sick leave information and the maintenance of sick leave records are another matter. As to the efficiency of that operation, its responsiveness to sick leave problems was reminiscent of the Drones Club, that hallowed institution of P.G. Wodehouse, following a pleasant lunch, with most of its members asleep or falling asleep. "Did old Bruno ever call today?" one member might ask. "Someone called," might be the reply. "Can't remember his name."
Various documents produced by the Department of Police purported to contain all records of sick leave exercised within the Urban Squad. In particular, there was produced the log book in which compliance with sick leave requirements presumably was recorded. However, all testimony by those Police Department personnel who were personally acquainted with the keeping of this book, actually indicated that this "call-in, call-out" book was infrequently used and reflected only a fraction of those notations one would expect to find if the Duty Officer properly recorded there all the messages regarding sick leave rules compliance. Captain Richard Martin testified that although he had been in charge of the Patrol Division for many years, had been a District Commander and was presently the Commander of the House of Detention, he had never seen a "call-in, call-out" book before, such as was produced at the hearing of this matter before the Hearing Examiner.
Officer Bruno testified that at all times required he called his place of assignment, the Urban Squad office, in every instance when he was returning to or departing from his place of confinement. He testified that it was his intention throughout the period to abide by the rules and regulations. For this reason, he testified, he had consulted with his immediate supervisor, Lieutenant Rinal Martin, Deputy Chief Duke, the City Chief Administrative Officer, Reynard Rochon, and the Health Service Section of the Department of Police.
With regard to medical testimony, the only such evidence was introduced by Officer Bruno. He called as a witness a personal physician, Dr. Harry Philibert, who testified concerning the heart condition which Bruno has had for many years and which was documented in the record.[20] No one from the Police Department appeared to rebut such evidence as to Bruno's physical capabilities.
Captain Martin said that, had he known of Bruno's need for sick leave, he would have acted at the first indication. Specifically, he testified, he would have called Bruno to his office as his commanding officer to discuss the situation with him and possibly could have advised Bruno of any possible hazard of violation of sick leave regulations at that time. Chief Parsons, also, admitted on the witness stand that had he seen the initial card filed on October 21, 1979, he would have tried to do something about it at the time. The Department did not contest the fact that Officer Bruno was in fact sick and the only testimony before the commission in this regard is that of Dr. Harry Philibert, who was offered both as Bruno's personal physician and as an expert.
*1094 Bruno never disobeyed any direct orders from his superiors throughout the course of his activities. He was never advised, cautioned nor otherwise notified of Department dissatisfaction with his conduct until very shortly before his precipitous termination.
His pleas for assistance with his medical and personal problems, both within the Department chain of command and to City officers, were met with indifference or hostility. Early on he made an unsuccessful effort to communicate with Deputy Chief Duke. On January 12, 1980, Bruno met the City's Chief Administrative Officer, Reynard Rochon, at a downtown hotel to discuss Bruno's union activities and the seeming impropriety of conducting such activities while on sick leave. Bruno asked Rochon to intercede on his behalf so that he might be placed on retroactive annual leave and thereby be relieved from the sick leave regulations. However, no action was taken.
There is nothing in the record to indicate that the appellant has ever been accused of any act by the New Orleans Police Department which could be described as immoral or illegal. During his absence from duty due to illness, this officer appears to have obeyed orders directed to him to the best of his ability and to the extent that his medical condition would safely permit. He was not accused of acting in concert with other officers so as to create a manpower shortage by abusing sick leave.
This string of samples from the Civil Service Commission hearing serves to confirm that the case against Officer Bruno was a sham. If it hadn't been obvious before, it became obvious at the hearing. District attorneys, when a case falls apart during its presentation in court, learn simply to abandon prosecution and go on to the next case. However, there was no next case here and the leader of the Mardi Gras police strike was the target.
This extensive, even prolonged perhaps, recapitulation of the evidence from the hearing makes it clear that Officer Bruno was not guilty of the charges mounted against him. More than that, it indicates what Bruno really did not have to prove: that he was innocent of these charges.
How sharper than a serpent's tooth is a police superintendent, already harassed by the many problems of running a police force, who has been humiliated before all the world by the leader of a police union. To have maintained any semblance of fairness, the man most embarrassed by Bruno's Mardi Gras strike should not have been the judge and jury dismissing him from the force.
IV
Crime and Punishment
Martin: Did this March 14, 1980 dismissal (of Officer Bruno from the police force) have any relation with the fact that approximately on March 11 PANO announced their affiliation with the AFL-CIO?
Parsons: No, sir.
Martin: Just coincidence?
Parsons: Just coincidence. (Emphasis added).[21]
The appellant is a most unlikely candidate to have been targeted as the great scoff-law of departmental regulations. In his thirteen years as a police officer he was never accused of violating a single on-duty regulation. How strange it was that his long hidden tendency to fall afoul of regulations apparently did not reveal itself until he became head of the police unionand, even then, only after the cancellation of Mardi Gras.
And how strange it was, too, when he finally was found guilty of violating the sick leave regulations, that the punishment was so explosively disproportionate. He was sent rattling down the chute, exiled for all time from the world he had been part of for so many years, dismissed from the police force he had served long and well. *1095 Why, one has to ask, was he not given instead a suspension or a fine? Why was there no moderation of any kind? Quite obviously the answer is: because Officer Bruno was being punished, for his actions as the leader of the police union.
On March 11, 1980, PANO (the police union) announced that it was going to join the AFL-CIO. Did Chief Parsons notice this interesting announcement of the betrothal of part of his police force to the national union? Did he perhaps have a slight reaction to this news release? Did he possibly recall that Officer Bruno was the president of PANO? Does a bear sleep in the woods?
On March 13, 1980, PANO was granted its local AFL-CIO charter out of Washington, D.C.
On March 14, 1980the following day Parsons wrote Officer Bruno informing him that he was discharged from the police force.[22]
At the time of being fired, Bruno was returning from Washington with a new AFL-CIO charter for his union. That's the way it really went down. Before the camouflage was set up and made the facts harder for the people to see, this is how Bruno was disposed of for doing his police union work perhaps not wisely but too well.
So what of the much vaunted "crime of the century", the official charge that Bruno "violated police sick leave regulations"? The simple truth is that this piece of bureaucratic deception had about as much to do with reality as the proverbial flowers that bloom in the spring.
I am mystified that the other judges on this panel have been unable to see and recognize so transparent a railroading as was done to this particular City employee. In the face of the astonishing facts surrounding his abrupt dismissal immediately after the AFL-CIO incident how can they, I ask myself, act as if this is a matter concerning sick leave regulations?
Indeed, one of the indicators, early on, that the whole "sick regulations" tableau had been untrue lay in the incredibly disproportionate sentence dropped on Bruno's head. So harsh a sentence for such a relatively minor infraction underscores the actual motivation behind the ersatz investigation and previously determined conviction of the police union leader.
For example, there are laws against jaywalking but we don't mash violators into the asphalt with steamrollers in order to discourage future jaywalkers. There are even laws against removing labels from polyester mattresses and pillows, but we don't drag violators through the streets in chains. Perhaps, however, the extremity of the sentence served to direct attention to what was being accomplished behind the artful diversion.
And art there was in the City's chronicle of Bruno's supposedly inculpatory activity. The recitation of so-called "violations" committed by Bruno, for example, consists of an accumulation of activities not unusual for a union leaderbut activities which predictably must appear to the public, with its preconceived image of police work, as outrageous for a policeman.
However, Officer Bruno had simply been doing all along what his union responsibilities required that he doobtaining publicity for the union as its headand what his superiors plainly could anticipate that he would continue to do. And, as the record indicates, this arrangement obviously had more than satisfied the Police Department's high command and the City administrationat least, prior to the Mardi Gras strike and the subsequent betrothal of Bruno's union to the AFL-CIO.
By presenting such seemingly breezy interludes as being sinister when performed by a policeman (e.g., "addressing a Mardi Gras krewe" or "attending a fund raiser for President Carter" or "giving a radio interview for three hours") the effect was *1096 accomplished of making the police union officer look irresponsible, even flip, to the public. He "asked for it," so the reasoning would go, "and he got it." It must have made it all the easier, when the time came, to roll him out of the way.
Visualize, if you will, a scene: A raised platform alongside the river. The band is playing as a new addition to the New Orleans skyline is topped off. Colored balloons are floated off into the sky. A politician is speaking: "And so our city continues to prosper as industry and labor move ahead into the future hand in hand." From behind some potted shrubs, what apparently is a body wrapped in canvas is rolled out, falls off the platform and splashes into the river. An observer standing nearby grabs a presiding official by the shoulder. "Did I just see what I thought I saw?" he asks. "No," replies the official, "you didn't. It was nothing at all. A union fellow. He just got all balled up with some pretty heavy regulations." "You mean he ran afoul of sick regulations? In that case, he asked for it and he got it."
That is, of course, not precisely what happened in the case at bar. However, it is close enough to what happenedas an analogy, at leastto help us appreciate the disproportion, the unfairness and the outright inhumanity of the City administration's action taken against Bruno.
They couldn't break the union, so they broke the union leader.
It was unfair and unsupported by any honest evidence for Superintendent Parsons to find Officer Bruno guilty of violating Police Department sick regulations. Moreover, it was manifestly unjust for the Superintendent to dismiss him from the department for such alleged violations. And it was error for the Civil Service Commission to uphold these actions.
In my judgment, this case from the outset was a fraudulent contraption, the sole object of which was to ensnare and punish a police union officer in disfavor with the City administration. What motivates officials who so casually allow such an injustice to occur? Is it because the City employee who is being drawn and quartered is sufficiently lower than they are on the totem pole that they feel the press will take no notice?
Our court system is just where this easily perceivable kind of railroad job finally should have been recognized and stopped. But it didn't happen that way. Perhaps it's just a case of the herd mentality with each participant merely doing what everyone before him did. Or perhaps there now exists in New Orleans some kind of secret officials' club whose members wink at a case like this as they press the button which drops the City employee down through the trap door. Well, if there is a club like this I won't belong to it.
I dissent.

ON REHEARING
We granted rehearing in this case to reconsider appellant Bruno's challenge to the constitutionality of the New Orleans Police Department's sick leave regulations in light of the recently decided case of Pienta v. Village of Schaumburg, 710 F.2d 1258 (7th Cir.1983), which held sick leave regulations similar to those involved in the present case to be violative of several fundamental rights. Being neither persuaded as to the soundness of that decision nor convinced of its applicability to the case at bar, we re-affirm the trial court's judgment.
In Pienta, three officers of the Village of Schaumburg Police Department filed a civil action seeking declaratory and injunctive relief to prevent the enforcement of departmental regulations which confined police employees to their residences while on sick leave. Such officers were allowed to leave home only for specific necessities, i.e., "to go to a hospital, or visit a doctor or secure medicine". Absences were to be preceded by notice to the communications officer as to the name and address of the doctor (or the hospital or drugstore) visited by the infirm policeman. The regulations also required those on sick leave to secure authorization from the Chief of Police before *1097 changing their place of recuperation or leaving the state.
In affirming the lower court's injunction, the federal court of appeal held that the regulations in question infringed upon several fundamental rights, among them, the right to vote, Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); the right to travel, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); freedom of religion, Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); and freedom of association, NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Pienta, supra, at 1260.
Finding these fundamental rights to be implicated, the Pienta court required the state to justify the regulations by proving them to be necessary to a compelling state interest. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The court held that the defendants' stated interest in "avoiding abuse of the liberal sick leave policy and protecting the public fisc; efficiently allocating manpower by fostering an expeditious return to work and requiring those on leave to stay by the phone in case they are needed; and maintaining the morale of those who must fill in for those on leave, do not rise to the level of compelling interest." Pienta, supra, at 1260.
Pienta held, further, that the regulations were unnecessary to the accomplishment of the above-asserted interests, and that less restrictive methods were available to the department to prevent policemens' malingering and the taking of unjustified sick leave.
Accordingly, the court found the regulations to be unconstitutional and enjoined their enforcement.
We do not subscribe to Pienta's analysis of the constitutional issues. It is frequently the case that when a statute or regulation is challenged as an abridgment of constitutional rights, the level of scrutiny applied by the reviewing court determines the outcome. As Professor Gunther has noted, scrutiny which is strict in theory is assuredly fatal in fact. See Gunther, The Supreme Court 1971 TermForeword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection, 86 Harv.L.Rec. 1, 8 (1972).
Pienta erred in relying upon Elrod v. Burns, supra, for the proposition that such regulations as these must stand the test of strict scrutiny. To the contrary, the combined effect of Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) and their progeny requires a more lenient standard of review.
In Burns, supra, the Supreme Court struck down the political patronage system in the Cook County, Ill. Sheriff's Office. According to that scheme of favoritism, it had been the practice of the sheriff, when he assumed office from a sheriff of a different political party, to replace non-civil-service employees of the sheriff's office with members of his own party. The Burns plaintiffs were among those who had been fired solely because they refused to become Democrats in accordance with the newly-elected Sheriff's own party affiliation.
The Supreme Court, in affirming injunctive relief, held the Cook County patronage system to be a "severe restriction" of political belief and association which lie at "the core of activities protected by the First Amendment" Id. 427 U.S. at 356, 96 S.Ct. at 2681. The Cook County employees were coerced to hold beliefs that they did not truly espouse, and to politically associate with those in whom they reposed no political faith.
The patronage system was thus viewed by the Court as an attack upon "association and belief per se", not merely conduct. Id. at 363, n. 17, 96 S.Ct. at 2685, n. 17. Such practices, the Court held, infected the political process itself and subverted "`the deeper traditions of democracy embodied in the First Amendment. Illinois State Employees Union and Lewis, 473 F.2d [561] *1098 at 576 [(7th Cir.1972)].'" Id. at 357, 96 S.Ct. at 2682.
In analyzing the constitutional claim, the Court recognized that "[i]t is firmly established that a significant impairment of First Amendment rights must survive strict scrutiny." Id. at 362, 96 S.Ct. at 2684. (Emphasis added).
It is readily apparent that Burns is distinguishable from the case at bar, and that the considerations which made strict scrutiny appropriate to that case are nowhere to be found here.
First, Burns did not hold, as Pienta seems to say, that any infringement upon fundamental rights, however slight and indirect, gives cause for strict scrutiny rather, it is "a significant impairment" of fundamental rights which has that effect. Thus, no matter how tidy the mechanical distinctions between "strict scrutiny" and "mere rationality", we cannot escape making judgments of degree. Pienta is unwilling to admit that.
There is further reason to reject the application of Burns to this case. The patronage system at work in Cook County was a direct assault upon association per se; the police sick leave regulations are not. The Cook County system required an employee's false association with those whom he politically opposed, and in doing so, sought to invade the political mind; the police sick leave regulations do neither. In Burns, the patronage system as a whole was held to be a substantial threat to the foundations of democracy; that cannot be seriously urged of these police regulations. Finally, the Cook County system posed an absolute bar to a certain kind of associationmembership in the Republican Party; the regulations in this case merely tell a police officer, in a inferential way, that if he is too sick to work, his right of association must be exercised at home.
Thus we reject the appellant's argument that Elrod v. Burns, supra, governs the level of scrutiny to be applied to these regulations.
In Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), First Amendment rights at least as fundamental as those asserted here were not afforded the shield of strict scrutiny. There, in a pure speech case, a school teacher sought reinstatement after having been fired for writing a letter to the editor criticizing the local school board's handling of certain proposals to raise revenue for the school. The Supreme Court granted relief, holding that the teacher's free speech interest had been violated by his dismissal. In reviewing the school board's harsh reprisal, the Court did not conduct a "strict in theory, fatal in fact" analysis, but instead, sought "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568, 88 S.Ct. at 1734-1735.
The Court's preference for a balancing test rather than strict scrutiny analysis was prompted by its recognition that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. at 568, 88 S.Ct. at 1734.
The principles announced in Pickering apply with equal force today. See Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "Even enumerated rights, such as those guaranteed by the First Amendment, are limited by the need for discipline, commensurate with the nature of the organization to which one belongs." Petrey v. Flaugher, 505 F.Supp. 1087, at 1091 (E.D.Ky.1981); citing Brown v. Glimes, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (military); Kannistano v. City and County of San Francisco, 541 F.2d 841 (9th Cir.1976); and Magri v. Giarrusso, 379 F.Supp. 353 (E.D.La.1974) (police).
*1099 In Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) the Supreme Court, applying a "mere rationality" standard of review, affirmed the right of a police department to regulate its officers' hair length. Proceeding from Pickering, supra, the Court emphasized that the plaintiff challenging the hair regulation was not merely a public employee, but beyond that, a policeman. Police regulations which affect general liberty interests, the Court held, cannot be viewed in isolation, but must be measured within the context of the police force's chosen mode of organization.
Kelley recognized that such choices are entitled to the same presumption of validity as legislative choices designed to promote aims within the scope of the State's police power. "Thus, the question is not ... whether the State can `establish' a `genuine public need' for the specific regulation. It is whether respondent can demonstrate that there is no rational connection between the regulation, based as it is on the county's method of organizing its police force, and the promotion of safety of persons and property." Id. at 247, 96 S.Ct. at 1446.
Having organized its police force according to a quasi-military model, the police department was entitled to deference in its decision to require military haircuts, at least in the absence of some showing by the plaintiff that the regulations were irrational.
Several courts have held, for the reasons expressed in Kelley, that police sick leave regulations such as those in question today need not stand the test of strict scrutiny.
Vorbeck v. Schnicker, 660 F.2d 1260 (8 Cir.1981), held that police regulations which proscribed leaving the city for a period of 24 hours without first having obtained the permission of the commanding officer, and which prohibited an officer from leaving his residence or place of confinement while on the sick list except to obtain medical treatment or attention, were subject to "mere rationality" review, citing Kelley, supra.
In affirming the district court's dismissal of the plaintiffs' claims, the Vorbeck majority held that in the absence of plaintiffs' showing specific instances of irrational application of the sick leave regulations, the case was non-justiciable. By necessary implication, regulations were held to be constitutional on their face. In a concurring opinion, it was stated:
I would affirm the judgment of the district court dismissing on its merits the claims of facial unconstitutionality. A state may demand of its police officers a more exacting standard of conduct than it could validly impose by criminal statute on citizens in general ... I would hold the regulations valid on their face, without prejudice, of course, to any later claim that they may be invalid as applied to particular persons or situations. (Arnold, J., concurring at 1267).
In Loughran v. Codd, 432 F.Supp. 259 (E.D.N.Y.1976), the court rejected a policeman's challenge to regulations which, in all material respects, are identical to those before the bar. There, as here, the plaintiff contended that Kelley, does not govern in cases where there is an assertion of fundamental rights. Loughran rejected that contention, and correctly noted that for the purpose of decision, Kelley elevated the plaintiff's asserted right to the status of a liberty interest within the Fourteenth Amendment, but nevertheless applied a "mere rationality" standard of reviewbecause the plaintiff was a police officer whose department has chosen to organize itself along paramilitary lines.
Loughran found the questioned sick leave regulations to be a reasonable means to eliminate "gold bricking" and sick leave abuse, thereby ensuring that each officer carried his fair share of the work load. The regulations thus promoted discipline and morale within the police department, and accordingly, they were upheld as facially valid.
Earlier, in Gissi v. Codd, 391 F.Supp. 1333 (E.D.N.Y.1974), a policeman, bound by sick leave regulations similar to those which applied to appellant Bruno, moved to *1100 enjoin their enforcement, contending that the regulations were unconstitutional. The court declined to rule upon the broad question of facial validity, but noted that "[s]ome restrictions of the activity of a man on sick leave are justifiable in order to prevent malingering or abuse. The Police Department should be in a position to verify whether plaintiff's absence from his residence is for a legitimate purpose and consistent with his claim of total disability to perform even restricted duty." Id. at 1336.
The Gissi court granted injunctive relief, however, finding that as applied to the plaintiff, who had asserted reasonably necessary grounds for absence from homethe need to visit his children under a court decree allowing visitation every other Sundaythe regulation was irrational and arbitrary. Gissi is therefore the case of which Vorbeck v. Schnicker, supra, spoke when it stated that "the rules, if carried to their limits, might be enforced as to unreasonably restrict the police officers' constitutional rights." Id. at 1264. (Emphasis in original).
The summation of the preceding cases yields these principles: first, that police regulations, when viewed within the context of a department that has chosen to organize itself along paramilitary lines, are entitled to the same presumption of validity as a State's legislative choices concerning the exercise of its police power; second, that such choices will be sustained unless shown to be arbitrary and irrational; third, that police sick leave regulations which restrict the travel of a convelescing police officer are not arbitrary and irrational per se; and finally, that because such regulations are not beyond unreasonable and arbitrary application, where they are applied in such a manner, the regulations will be enjoined.
Regarding the facial validity of the regulations challenged by Officer Bruno, we, as Loughran, find such regulations to be rationally related to the maintenance of discipline and morale within the New Orleans Police Department. Those are indeed compelling interests in a city whose population and police force are as sizeable as New Orleans'. The regulations at issue further discipline and morale by ensuring that policemen do not regard sick leave as the equivalent of a vacation at full pay. Each officer is thereby encouraged to pull his fair share of the load, and to report "sick" only when he is truly incapable of performing any police duty. The department's choice to regard paid sick leave as something other than paid vacation is one that is eminently rational. We therefore find the regulations to be constitutional on their face.
With reference to Officer Bruno's "as applied" challenge, the facts of this case, as set out in our original opinion, admit no doubt that the regulations were neither arbitrarily nor unreasonably applied to the appellant. We are not faced with a situation where, as in Gissi v. Codd, supra, a reasonable claim of necessity dictates an exception to the general rule, or where "going by the book" causes an injustice. To the contrary, the great injustice in this case is in Officer Bruno's conduct.
Nor have the regulations been enforced against the appellant in a discriminatory manner. As we originally noted, other policemen have been disciplined by the department for far less flagrant abuse of sick leave.
For the reasons assigned, we find the sick leave regulations disputed in this case to be constitutional on their face and as applied. Our original opinion is reinstated.
AFFIRMED.
GARRISON, Judge, dissenting.
I
The Man Who Stole Mardi Gras
"And yet you continued to be actively engaged in union activities, you went out of town on at least three occasions, to Detroit, New York and Florida on union business, and you attended at least two union meetings and you spoke to the *1101 Krewe of Endymion concerning possible police action ..."[1]
This case appears to me to involve the officially sponsored railroading of a veteran police officer of many years' service. It grows out of a classic union-busting effort of a kind rarely seen in present day city administrations. At another level, the case addresses itself to the elaborate use of the machinery of justice to accomplish injustice.
Specifically, the case concerns the dismissal of Officer Vincent Bruno supposedly for violation of "police department sick leave regulations." Officer Bruno had thirteen years of service and was well on his way towards earning a sixteen-year retirementthat lure which was established during the postwar years to bring into the police department men who otherwise might not have joined.
Ordinarily, the fact that an officer had many years of service, and was close to earning his pension, would be cause for some consideration prior to any action against him for an alleged infraction of minor regulations. But this was not the case with regard to Officer Bruno. He was the man whoor so some apparently thoughtstole Mardi Gras. He was the Grinch who stole Christmas.
For Officer Bruno was the leader of the police union when it struck against the City of New Orleans. As the result of this police strike Mardi Gras was cancelled for the first time since World War II.[2]
From the announced circumstances of Bruno's firing for violation of "sick regulations" by Police Superintendent Parsons, a casual observer might think that little notice had been taken of his police union activities, of the police strike which he led against the City and of the subsequent cancellation of Mardi Gras. A review of this case, however, leaves no doubt that the real reason for the dismissal of Officer Bruno was his activity as the union leader of the police strike and the closing down of Mardi Gras which followed. One additional factor, the joinder of his union with the national AFL-CIO quite apparently determined his actual date of dismissal because he was fired the very next day (see page ___ hereunder). The allegation that Bruno was fired for violation of any kind of regulation whatsoever, as will be seen, is sheer artifice and a distinct fraud upon our legal system.
The particular union of which Vincent Bruno was the headand which he was leading at the time of the police strike against the Citywas the Police Association of New Orleans (PANO). The cancellation of Mardi Gras by the City administration fell on February 27, 1979.
It is rather hard not to notice that in March, 1979, the City Finance Officer informed that union, among other organizations, that the City was going to end its practice of taking out payroll deductions, requested by City employees, in the union's behalf. It was announced that these deductions, known as "check-offs", were being stopped by the City because of a reduced budget. This action, had it been successful, could have created an overnight survival problem for the police union, not to mention the others.
The City administration's effort to stop payroll deductions from going to the police union and other associations soon enough was in the courts, where ultimately it was blocked. But, as the record in the instant case shows, the City's investigation of Officer Bruno was underway by November of 1979, and the results of that Alphonse and Gaston tableau are now before us.
All of this was in the name of good government, of course. The check-offs for the police union were to be terminatednot because the union had struck against the City at Mardi Gras, but ostensibly because the administration was concerned about *1102 budget problems. The thirteen-year police career of the union leader was to be terminatednot because he had led the police union's strike against the City, but ostensibly because he had problems with his sick leave. Or so it was all publicly explained by administration spokesmen.
However, I cannot blind myself to the true circumstances in which the City, after having attempted to discipline the police union, managed to catch its leader by the heels. When the royal elephant is found missing and the power elite charges its selected suspect with dropping cracker crumbs on the floor, are we really supposed to believe that the local government is frenzied by cracker crumbs on the carpet?
It is plain that the City sought to dispose of the problem of the pesky police union officer by resorting to the cunning and deceitful use of law enforcement machinerya project in which it succeeded more than I would have thought possible. It is also plainfrom the enthusiasm with which they joined in the chasethat once the hunt was underway the pursuers did not lack for official allies in cornering the union leader. A few may have felt unhappy about the cancellation of Mardi Gras and a few others may have felt unhappy about unions, but they seem to have put aside their personal feelings out of their common devotion to the Police Department's sick leave regulations. Surely, they must have reasoned, a small public hanging might not be out of order for the man who stole Mardi Gras.
The writer, Kafka, makes the point that sometimes those in power are not overly concerned about the existence of actual guilt so long as the proper law enforcement procedures are followed.[3] In any case, the official phalanx rolled smoothly against the leader of the police union. The Police Department finished its part of the case when Superintendent Parsons charged Officer Bruno with violating sick leave regulations (and then, in the same breath, found him guilty).[4] The City Attorney's Office adroitly explained how the top command of the Police Department had managed to crack the case: "During Mr. Bruno's absence from work his superiors suspected that Mr. Bruno was possibly in violation of sick leave regulations."[5]
One can almost sense the impatience with Officer Bruno's plea of innocence at the Civil Service Commission hearing. "... (Bruno) contends that he didn't know of the 1978 sick rule change," an assistant city attorney argued. "Surely, Mr. Bruno, a police officer with thirteen years experience, knows it's his obligation to keep current with the department's rules."[6]
When the government acts ignobly it injures not only the individual who has become its prey. It hurts our system of laws as well. Many people observe what is actually happening and, not fooled by the attendant protocol and rote of a particular travesty which may be unfolding before them, lose confidence in the entire machinery of justice.
To allow a law enforcement authority to switch a charge to a more convenient accusation is tantamount to encouraging that authority to select the convenient charge at the outset and find the evidence later. It is all very well for the Queen to announce "Sentence firstverdict afterwards,"[7] but in New Orleans the Superintendent of Police *1103 cannot do that and neither can the City Administration.
The charges initiated against Officer Bruno plainly were arbitrary, capricious, discriminatory and contrived. In my regard, the majority of this panelinstead of lending credence to such mendacity should have concluded that it was error for the Civil Service Commission to uphold such obviously false charges.
II
Freedom of Speech
"No law shall ever be passed to curtail or restrain the liberty of speech or of the press; any person may speak, write or publish his sentiments on all subjects, being responsible for the abuse of that liberty."[8]
The circumstances of the "sick leave violation" charges against Officer Bruno indicate perception that any earlier charges related to his leadership of the police strike might encounter First Amendment problems. Waiting for a distinct time interval, then charging him with an alleged offense off to the side of the picture, clearly was the chosen solution. Thus it came to pass that, some months after the Mardi Gras strike had subsided, Bruno "ran afoul of sick leave regulations."[9] Nevertheless, like Wile E. Coyote having another one of his inventions blow up in his face, Officer Bruno's superiors appear to have run afoul of the First Amendment.
Both the United States and Louisiana Constitutions forbid government actions which have the effect of denying freedom of speech to any individual.[10] I believe that this factor alone should act as a bar to maintaining Officer Bruno's conviction.
Superintendent Parsons' letter to Officer Bruno informed him that he was being terminated for violations which included engaging in the following actions without permission:
"... On December 28, 1979, you were interviewed at the WWL Studios located at 1024 North Rampart, New Orleans, Louisiana, by I.J. Hudson." (Emphasis supplied).
"... On January 16, 1980, you were interviewed by Sally Ann Roberts of WWL-TV away from your place of confinement." (Emphasis supplied).
"... On January 22, 1980, you addressed the Krewe of Endymion at the Fountain Bay Hotel located at 4040 Tulane Avenue, New Orleans, Louisiana." (Emphasis supplied).
"... On February 29, 1980, you were interviewed at WDSU Studio at 520 Royal Street, New Orleans, Louisiana." (Emphasis supplied).
"... On March 10, 1980, you were a guest on a radio talk show for approximately three hours at WSMB Radio Station located at the Maison Blanche Building at 901 Canal Street, New Orleans, Louisiana." (Emphasis supplied).[11]
The single common factor in each of these charges was Officer Bruno's exercise of the right of free speech. Yet a major part of Bruno's job as leader of the police union involved communication by him not only to fellow police officers but to the public at large. Such systematic conversion of the interchange of ideas into "violations" of departmental regulations could have a chilling effect on future union leaders or on others similarly placed. Superintendent *1104 Parsons acted improperly in this regard and the Civil Service Commission committed error in upholding his action.
III
The Police Department's Case
Mr. Martin: How religiously is this book kept?
Sgt. Thompson: I don't know, personally.
Q: You don't keep it up?
A: No sir, I don't.
Q: Who does?
A: It's the responsibility of the desk officer.
Q: And who does the desk officer work for?
A: He works for the platoon commander.
Q: Which is you?
A: Which is myself.
Q: But you don't know whether it's really kept up religiously or not?
A: No.[12]
Even under the Department's official fiction that "sick leave violations" constituted the gravamen of Bruno's offense, its case at the Civil Service Commission hearings must be regarded as a prosecutorial disaster. Put in terms of a missile launching, it would be fair to say that the missile fell over on the launching pad.
Evidently the attorneys representing the police force assumed that they could show the justification for Superintendent Parsons' dismissal of Officer Bruno by calling the officer as their main witness. However, as some prosecutors might have explained to them in advance, Bruno's testimony was very destructive to the police department's case. It showed, at the outset, that a gulf had developed between Officer Bruno and the police force concerning the interpretation of the key sick regulations involved. It showed, further, that the police department had made no serious effort to straighten out this communication problem (which plainly developed after the Mardi Gras strike, inasmuch as Bruno had had health problems for many years while on the force with no sick leave problems of any kind arising).
The testimony demonstrated clearly that the police department's control of procedures maintaining a sick leave log book for checking in and checking out of one's residence ranged from catastrophic to nothing at all. For example, the appellant was asked if he had acted as a judge at a talent contest at Frankie Brent's Lounge in Metairie and he replied in the affirmative. Then, somewhat representative of the entire questioning (this constituting the major part of the City's case), the colloquy developed along the following lines:
Q: You know whether or not you left to attend this contest without notifying the Department?
A: I called the Urban Squad and told them I was going to the address 4724 Utica Street.
Q: You recall who you talked to at that time?
A: No.
Q: But that should be in the sick leave book that's maintained?
A: I didn't know that there was a sick leave log book. I never heard of one.
Q: When someone called you when you were working, to report that they were leaving their home to go to the doctor or the clinic or something (sic), what would you do? How would you handle that?
A: Write it on a piece of paper and when they called back, throw the piece of paper away.
Q: You never forwarded that information to any of your prosecutors?
A: Never was advised to. I wasn't even aware that there was a log at the Urban Squad or any other Division.[13]
*1105 Again, in addition to this representative sample of the absence of support for the sick leave charges he was asked whether he had checked in with the Urban Squad before departing for Detroit (on union business). His answer was: "Well, that's not entirely correct. I notified the Urban Squad office."[14] Asked whether he had given notification before leaving to speak to the Krewe of Endymion at the Fountain Bay hotel, he replied in the affirmative, particularizing that he had talked to the Deputy Chief before he left.[15] Asked if he had given notification before leaving for a PANO meeting in January[16] and before leaving for a fund raising affair for President Carter[17] his answer continued to indicate that he had.
Asked whether he had given notification before leaving to speak at a February PANO meeting at 315 South Broad Street, he again responded affirmatively.[18] Here, incidentally, he was asked whether he had given a news conference at PANO, and he replied that he had.[19] Bruno's allowing of news coverage makes apparent the fact that his allegedly incriminating activity was entirely open and aboveboard.
At no time in Officer Bruno's career, the testimony showed, had he been cautioned, warned or disciplined regarding sick leave abuse until shortly before his termination. At no time during Officer Bruno's illness did any person from the Department of Police inform or caution him regarding his methods of reporting departures from and returns to his place of confinement.
The Department of Police failed to establish that Officer Bruno at any time was advised either verbally or in writing that he was abusing the Department's sick leave policy. Officer Bruno testified, and other testimony corroborated, that he had sought to work out his physical and psychological problems in such a way that he would not be breaking Department rules nor interfering with the orderly functioning of the Department. Indeed, the record makes it notably clear that heand not the Departmentwas the sole protagonist in that effort.
Even though these examples of deteriorating charges were selected at random, they show how the police department's case died aborning. And that's the way it went with regard to the effort to show that Officer Bruno systematically failed to inform the Urban Squad before he went somewhere. In instance after instance, the testimony showed that either he had notified the squad or the records could not be found.

The Drones Club
The New Orleans Police Department is generally represented, and justifiably so it would appear, as one of the better police departments in the country. In recent years the law enforcement record with regard to crimes of high priority has been good.
However, the portions of the transcript just referred to make it plain that the dissemination of sick leave information and the maintenance of sick leave records are another matter. As to the efficiency of that operation, its responsiveness to sick leave problems was reminiscent of the Drones Club, that hallowed institution of P.G. Wodehouse, following a pleasant lunch, with most of its members asleep or falling asleep. "Did old Bruno ever call today?" one member might ask. "Someone called," might be the reply. "Can't remember his name."
Various documents produced by the Department of Police purported to contain all records of sick leave exercised within the Urban Squad. In particular, there was produced the log book in which compliance with sick leave requirements presumably was recorded. However, all testimony by *1106 those Police Department personnel who were personally acquainted with the keeping of this book, actually indicated that this "call-in, call-out" book was infrequently used and reflected only a fraction of those notations one would expect to find if the Duty Officer properly recorded there all the messages regarding sick leave rules compliance. Captain Richard Martin testified that although he had been in charge of the Patrol Division for many years, had been a District Commander and was presently the Commander of the House of Detention, he had never seen a "call-in, call-out" book before, such as was produced at the hearing of this matter before the Hearing Examiner.
Officer Bruno testified that at all times required he called his place of assignment, the Urban Squad office, in every instance when he was returning to or departing from his place of confinement. He testified that it was his intention throughout the period to abide by the rules and regulations. For this reason, he testified, he had consulted with his immediate supervisor, Lieutenant Rinal Martin, Deputy Chief Duke, the City Chief Administrative Officer, Reynard Rochon, and the Health Service Section of the Department of Police.
With regard to medical testimony, the only such evidence was introduced by Officer Bruno. He called as a witness a personal physician, Dr. Harry Philibert, who testified concerning the heart condition which Bruno has had for many years and which was documented in the record.[20] No one from the Police Department appeared to rebut such evidence as to Bruno's physical capabilities.
Captain Martin said that, had he known of Bruno's need for sick leave, he would have acted at the first indication. Specifically, he testified, he would have called Bruno to his office as his commanding officer to discuss the situation with him and possibly could have advised Bruno of any possible hazard of violation of sick leave regulations at that time. Chief Parsons, also, admitted on the witness stand that had he seen the initial card filed on October 21, 1979, he would have tried to do something about it at the time. The Department did not contest the fact that Officer Bruno was in fact sick and the only testimony before the commission in this regard is that of Dr. Harry Philibert, who was offered both as Bruno's personal physician and as an expert.
Bruno never disobeyed any direct orders from his superiors throughout the course of his activities. He was never advised, cautioned nor otherwise notified of Department dissatisfaction with his conduct until very shortly before his precipitous termination.
His pleas for assistance with his medical and personal problems, both within the Department chain of command and to City officers, were met with indifference or hostility. Early on he made an unsuccessful effort to communicate with Deputy Chief Duke. On January 12, 1980, Bruno met the City's Chief Administrative Officer, Reynard Rochon, at a downtown hotel to discuss Bruno's union activities and the seeming impropriety of conducting such activities while on sick leave. Bruno asked Rochon to intercede on his behalf so that he might be placed on retroactive annual leave and thereby be relieved from the sick leave regulations. However, no action was taken.
There is nothing in the record to indicate that the appellant has ever been accused of any act by the New Orleans Police Department which could be described as immoral or illegal. During his absence from duty due to illness, this officer appears to have obeyed orders directed to him to the best of his ability and to the extent that his medical condition would safely permit. He was not accused of acting in concert with other *1107 officers so as to create a manpower shortage by abusing sick leave.
This string of samples from the Civil Service Commission hearing serves to confirm that the case against Officer Bruno was a sham. If it hadn't been obvious before, it became obvious at the hearing. District attorneys, when a case falls apart during its presentation in court, learn simply to abandon prosecution and go on to the next case. However, there was no next case here and the leader of the Mardi Gras police strike was the target.
This extensive, even prolonged perhaps, recapitulation of the evidence from the hearing makes it clear that Officer Bruno was not guilty of the charges mounted against him. More than that, it indicates what Bruno really did not have to prove: that he was innocent of these charges.
How sharper than a serpent's tooth is a police superintendent, already harassed by the many problems of running a police force, who has been humiliated before all the world by the leader of a police union. To have maintained any semblance of fairness, the man most embarrassed by Bruno's Mardi Gras strike should not have been the judge and jury dismissing him from the force.
IV
Crime and Punishment
Martin: Did this March 14, 1980 dismissal (of Officer Bruno from the police force) have any relation with the fact that approximately on March 11 PANO announced their affiliation with the AFL-CIO?
Parsons: No, sir.
Martin: Just coincidence?
Parsons: Just coincidence. (Emphasis added).[21]
The appellant is a most unlikely candidate to have been targeted as the great scoff-law of departmental regulations. In his thirteen years as a police officer he was never accused of violating a single on-duty regulation. How strange it was that his long hidden tendency to fall afoul of regulations apparently did not reveal itself until he became head of the police unionand, even then, only after the cancellation of Mardi Gras.
And how strange it was, too, when he finally was found guilty of violating the sick leave regulations, that the punishment was so explosively disproportionate. He was sent rattling down the chute, exiled for all time from the world he had been part of for so many years, dismissed from the police force he had served long and well. Why, one has to ask, was he not given instead a suspension or a fine? Why was there no moderation of any kind? Quite obviously the answer is: because Officer Bruno was being punished, for his actions as the leader of the police union.
On March 11, 1980, PANO (the police union) announced that it was going to join the AFL-CIO. Did Chief Parsons notice this interesting announcement of the betrothal of part of his police force to the national union? Did he perhaps have a slight reaction to this news release? Did he possibly recall that Officer Bruno was the president of PANO? Does a bear sleep in the woods?
On March 13, 1980, PANO was granted its local AFL-CIO charter out of Washington, D.C.
On March 14, 1980the following day Parsons wrote Officer Bruno informing him that he was discharged from the police force.[22]
At the time of being fired, Bruno was returning from Washington with a new AFL-CIO charter for his union. That's the way it really went down. Before the camouflage was set up and made the facts *1108 harder for the people to see, this is how Bruno was disposed of for doing his police union work perhaps not wisely but too well.
So what of the much vaunted "crime of the century", the official charge that Bruno "violated police sick leave regulations"? The simple truth is that this piece of bureaucratic deception had about as much to do with reality as the proverbial flowers that bloom in the spring.
I am mystified that the other judges on this panel have been unable to see and recognize so transparent a railroading as was done to this particular City employee. In the face of the astonishing facts surrounding his abrupt dismissal immediately after the AFL-CIO incident how can they, I ask myself, act as if this is a matter concerning sick leave regulations?
Indeed, one of the indicators, early on, that the whole "sick regulations" tableau had been untrue lay in the incrediably disproportionate sentence dropped on Bruno's head. So harsh a sentence for such a relatively minor infraction underscores the actual motivation behind the ersatz investigation and previously determined conviction of the police union leader.
For example, there are laws against jaywalking but we don't mash violators into the asphalt with steamrollers in order to discourage future jaywalkers. There are even laws against removing labels from polyester mattresses and pillows, but we don't drag violators through the streets in chains. Perhaps, however, the extremity of the sentence served to direct attention to what was being accomplished behind the artful diversion.
And art there was in the City's chronicle of Bruno's supposedly inculpatory activity. The recitation of so-called "violations" committed by Bruno, for example, consists of an accumulation of activities not unusual for a union leaderbut activities which predictably must appear to the public, with its preconceived image of police work, as outrageous for a policeman.
However, Officer Bruno had simply been doing all along what his union responsibilities required that he doobtaining publicity for the union as its headand what his superiors plainly could anticipate that he would continue to do. And, as the record indicates, this arrangement obviously had more than satisfied the Police Department's high command and the City administrationat least, prior to the Mardi Gras strike and the subsequent betrothal of Bruno's union to the AFL-CIO.
By presenting such seemingly breezy interludes as being sinister when performed by a policeman (e.g., "addressing a Mardi Gras krewe" or "attending a fund raiser for President Carter" or "giving a radio interview for three hours") the effect was accomplished of making the police union officer look irresponsible, even flip, to the public. He "asked for it," so the reasoning would go, "and he got it." It must have made it all the easier, when the time came, to roll him out of the way.
Visualize, if you will, a scene: A raised platform alongside the river. The band is playing as a new addition to the New Orleans skyline is topped off. Colored balloons are floated off into the sky. A politician is speaking: "And so our city continues to prosper as industry and labor move ahead into the future hand in hand." From behind some potted shrubs, what apparently is a body wrapped in canvas is rolled out, falls off the platform and splashes into the river. An observer standing nearby grabs a presiding official by the shoulder. "Did I just see what I thought I saw?" he asks. "No," replies the official, "you didn't. It was nothing at all. A union fellow. He just got all balled up with some pretty heavy regulations." "You mean he ran afoul of sick regulations? In that case, he asked for it and he got it."
That is, of course, not precisely what happened in the case at bar. However, it is close enough to what happenedas an analogy, at leastto help us appreciate the disproportion, the unfairness and the outright inhumanity of the City administration's action taken against Bruno.
They couldn't break the union, so they broke the union leader.
*1109 It was unfair and unsupported by any honest evidence for Superintendent Parsons to find Officer Bruno guilty of violating Police Department sick regulations. Moreover, it was manifestly unjust for the Superintendent to dismiss him from the Department for such alleged violations. And it was error for the Civil Service Commission to uphold these actions.
In my judgment, this case from the outset was a fraudulent contraption, the sole object to which was to ensnare and punish a police union officer in disfavor with the City administration. What motivates officials who so casually allow such an injustice to occur? Is it because the City employee who is being drawn and quartered is sufficiently lower than they are on the totem pole that they feel the press will take no notice?
Our court system is just where this easily perceivable kind of railroad job finally should have been recognized and stopped. But it didn't happen that way. Perhaps it's just a case of the herd mentality with each participant merely doing what everyone before him did. Or perhaps there now exists in New Orleans some kind of secret officials' club whose members wink at a case like this as they press the button which drops the City employee down through the trap door. Well, if there is a club like this I won't belong to it.

* * *
It is also noted that, with regard to the N.O.P.D. sick leave regulations, the holding of the U.S. Court of Appeal, 7th Circuit, in Pienta v. Village of Schaumburg, Illinois, 710 F.2d 1258 (7th Cir., 1983), appears to be applicable. As to sick leave, the police regulation in Pienta is virtually identical to that in the present case. The regulation in Pienta provided as follows:
"General Order No. 79-59, Schaumburg Police Department Standard Operating Procedure Code A-35.2 (Injuries on Duty)
I.F. Absence from Home:
* * * * * *
2. Employees on injury leave must remain at their residence at all times except for matters that relate to their injury. (Exception: hospitalized personnel). Each time it is necessary for an employee to leave their (sic) residence to go to a hospital, or visit a doctor or secure medicaine, they must notify the Schaumburg Police Department Communications Section and leave notice with the Communications officer as to the doctor's name and address that they are going to visit (hospital, drug store, etc.). Upon returning home, they will again notify the Communications Section by phone of their return.
* * * * * *
I.G. Personnel on injury leave will not change their place of recuperation or leave the state without authorization from the Chief of Police.
Administrative General Order No. 79-9, Schaumburg Police Department. Standard Operating Procedure Code A-24 (Sick Time)
I. SICK TIME
* * * * * *
B. It shall be the responsibility of all personnel reporting sick to remain at their residences until their next scheduled tour of duty, (exceptionif a scheduled day off immediately follows a sick day, the residency requirement will end at 0001 hours on the scheduled day off), unless they must go to a hospital or visit their doctor or secure medicine for their illness. However, if any personnel must leave their residence during their sick period, it shall be their responsibility to notify the Schaumburg Police Department Communications Section and leave notice with the Communications officer as to the doctor's name and address that they are going to visit, drug store, hospital, etc., and they will notify the Communications officer upon their return to their residence.
C. Personnel on sick leave will not change their place of recuperation or *1110 leave the state without authorization from the Chief of Police.
* * * * * *
I. The Administrative Division Commander with the approval of the Chief of Police may grant personnel stricken with serious illness or injury permission to leave their residence during the period of recuperation without requiring notification to the Police Department (i.e., heart attacks, major operations, broken limbs or serious injuries)." (AT 1262).
In Pienta, the Seventh Circuit Court of Appeal stated:
"In effect, these regulations put plaintiffs under house arrest until their return to work. Their rights to vote, to exercise freely their religion by church attendance, to go to court, to attend political or family gatherings, and to travel were infringed. See, e.g., Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (vote); Abington School District v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (religion); Shapiro v. Thompson, 394 U.S. 618, 629, 89 S.Ct. 1322, 1328, 22 L.Ed.2d 600 (travel); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (association). See also Gissi v. Codd, 391 F.Supp. 1333 (E.D.N.Y.1974) (in similar circumstances, plaintiff has right to visit attorney when necessary, and visit children at least once every two weeks). Since these regulations prohibit the exercise of constitutional rights, plaintiffs have standing to challenge them without attempting to disobey. Muller v. Conlisk, 429 F.2d 901, 903 (7th Cir.1970). Defendants apparently concede that the regulations infringe some of plaintiff's constitutional rights. They argue, however, that the rights infringed are not absolute, and that state regulation of the rights of a public employee must be evaluated under the rational basis test of Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708. This Court has already held that the test to be applied in determining the constitutionality of a government regulation of a public employee depends on the nature of the right affected. Division 241 Amalgamated Transit Union v. Suscy, 538 F.2d 1264, 1266 (7th Cir.1976), certiorari denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632. If a plaintiff's claim is grounded solely in the general liberty language of the due process clause as in Kelley, supra, the state need only demonstrate a rational relationship between the regulation and a legitimate state interest. If the public employee challenges limitations on rights specifically protected by other parts of the Constitution, the state must demonstrate that the regulation is necessitated by a compelling state interest and is narrowly tailored to meet that objective. Suscy, supra; contra, Loughran v. Codd, 432 F.Supp. 259, 263 (E.D.N.Y.1976) (applying rational basis test to police regulation).

Because several of the rights infringed by the regulations are protected by specific provisions of the Bill of Rights, defendants must demonstrate a compelling state interest to justify the regulations. See Elrod v. Burns, 427 U.S. 347, 362-363, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547. Defendants' stated interests in avoiding abuse of the liberal sick leave policy and protecting the public fisc; efficiently allocating manpower by fostering an expeditious return to work and requiring those on leave to stay by the phone in case they are needed; and maintaining the morale of those who must fill in for those on leave, do not rise to the level of compelling interests. In addition, these interests can surely be achieved without a blanket prohibition on plaintiff's freedom of movement.3
* * * * * *
"Finally, even under the rational basis test these regulations are of questionalbe validity. Defendants' basic argument is that an employee who is too sick or injured to report even for restricted duty is by definition too sick or injured to leave the house for any purposeto go to court, to church, to a polling place, to a *1111 family picnic, or to respond to an emergency call on a personal matter. Yet an employee injured with a broken arm may not be able to report even for restricted duty desk jobs, but he is perfectly able to go to church or to court on a parking ticket. An employee with the flu may not qualify even for restricted duty but is perfectly able to leave the house to pick up his child at school if she gets sick or injured and suddenly has to come home. In addition, enforcement of the policy will not necessarily serve the Department's stated purpose of preventing abuse so as to save money and conserve manpower. Because the regulations do not require a doctor's certificate for sick leave for less than three days, for example, the dishonest employee can feign illness for such time and simply collect sick pay as long as he stays in his home. The "stay at home" requirement thus has no relation to the medical needs of the individual employee, and as such, has no relation to the legitimate interest of the Department in preventing abuse. In fact, the sick leave regulation grants the Chief of Police, rather than a medical officer, the power to permit employees to leave their homes without requiring notification to the Department! Ct. Loughran v. Codd, supra, 432 F.Supp. at 261 (district surgeon had power to decide whether and to what extent home confinement appropriate).
Of course, a municipal police department has a legitimate interest in handling sick and injury relief policies to assure the ability to carry out its public services. Some restrictions on the activities of an employee on leave are justifiable, and the Department should be entitled to verify whether an employee's absence from home is consistent with a claim of disability. See Gissi v. Codd, supra, 391 F.Supp. at 1336. Here, however, the two challenged regulations go too far in infringing on established constitutional rights.
3 According to the Police Executive Research Forum and Police Foundation, Survey of Police Operations and Administrative Practices, Ch. 9, p. 67 (1981), cited by plaintiffs (Br. 10), 90% of the nation's police departments do not confine their employees to their homes during sick or injury leave." (AT 1259-1262) (emphasis added).
* * * * * *
In conclusion, I find, just as did the 7th Circuit, that the regulation fails to meet the compelling state interests test, that no realistic relationship exists between the regulation and the efficient operation of the N.O.P.D., that the regulation additionally fails to meet the rational basis test such that it is unconstitutionally overbroad and should be declared void.
Accordingly, I believe that Officer Bruno should be reinstated with full rank, privileges and other emoluments of office.
For the foregoing reasons, I dissent.
NOTES
[1] These regulations went into effect on June 22, 1975.
[2] Interoffice Correspondence, Department of Police, October 25, 1978. Submitted in evidence as City Exhibit No. 1.
[3] Appellant's own brief states, at page 10:

"What motivated Superintendent Parsons and his subordinates to want to dismiss Officer Bruno probably does not interest this Court. Counsel for appellant will be satisfied to submit to this Honorable Court that Officer Bruno received no notice, nor had he been sanctioned (suspended, et cetera) previously for sick leave abuse. Therefore reprimand, or possibly suspension, seems an adequate as (sic) punishment."
We respond, first, that Chief Deputy Kent had warned Officer Bruno as early as January 20, 1980 that his conduct was in violation of departmental regulations. Moreover, Officer Bruno's conduct prior to the events charged was not at issue before the Commission, nor should it be at issue here. We are concerned only with the violations alleged to have occurred between October 21, 1979 and March 14, 1980.
[1] Cross-examination of Officer Bruno at Civil Service Commission hearing. Page 85, Transcript II.
[2] Judicial cognizance, as taken here, is applicable to "... (6) ... the facts of history and the political, social and racial conditions prevailing in this state ..." R.S. 15:422.
[3] In The Trial Joseph K. is arrested but never told the reason for his arrest. At the court he is never told what the charges are. The court chaplain informs him that he will probably be convicted, however he does not know what the charges are either. Ultimately, two formally dressed men arrive at his home to pick him up. He is taken to an abandoned quarry where he is executed.
[4] See March 14, 1980 letter to Bruno from Superintendent Parsons.
[5] City Attorney's Memorandum on Behalf of the Department of Police, filed in connection with the Civil Service hearings. Transcript I.
[6] Ibid.
[7] See Chapter 12, Alice in Wonderland, by Lewis Carroll.
[8] Louisiana Constitution of 1974, Art. 1 § 7.
[9] This phrase is quoted from Judge Augustine's majority opinion in this case (upholding appellant's dismissal from the police force). Its language suggests that Bruno's sick leave problems simply represented a stroke of bad luck for him, free of any initiation by City officials lacking enthusiasm for his welfare. This theorywhich could be called the "open manhole" theory seems to suggest that there is no point in looking too closely behind the facts inasmuch as everything happens for the best (at least for those employees who know which side their bread is buttered on).
[10] U.S. Constitution, Amendment 1; Louisiana Constitution of 1974, Art. 1 § 7.
[11] Examples from the charges against Officer Bruno from Superintendent Parsons' letter of March 14, 1980. Transcript I.
[12] Pages 142-143, Transcript II.
[13] Pages 52-53, Transcript II.
[14] Page 44, Transcript II.
[15] Page 72, Transcript II.
[16] Page 75, Transcript II.
[17] Page 76, Transcript II.
[18] Page 77, Transcript II.
[19] Page 78, Transcript II.
[20] Officer Bruno, as the Police Department's personnel file showed, was retired from the National Guard active service in 1966 for a heart defect, the very same defect which has from time to time resulted in episodes of paroxysmal tachycardia which render Bruno temporarily disabled.
[21] Martin is Clyde P. Martin, Bruno's attorney at the Civil Service hearing. Parsons is Superintendent of Police James Parsons. This excerpt is from page 374-375 of Transcript III.
[22] Under the circumstances, this abrupt dismissal hardly meets the test of not being "arbitrary, capricious or discriminatory." See: Jones v. Louisiana Department of Highwasy, 259 La. 329, 250 So.2d 356, 359 (La.1971).
[1] Cross-examination of Officer Bruno at Civil Service Commission hearing. Page 85, Transcript II.
[2] Judicial cognizance, as taken here, is applicable to "... (6) ... the facts of history and the political, social and racial conditions prevailing in this state ..." R.S. 15:422.
[3] In The Trial Joseph K. is arrested but never told the reason for his arrest. At the court he is never told what the charges are. The court chaplain informs him that he will probably be convicted, however he does not know what the charges are either. Ultimately, two formally dressed men arrive at his home to pick him up. He is taken to an abandoned quarry where he is executed.
[4] See March 14, 1980 letter to Bruno from Superintendent Parsons.
[5] City Attorney's Memorandum on Behalf of the Department of Police, filed in connection with the Civil Service hearings. Transcript I.
[6] Ibid.
[7] See Chapter 12, Alice in Wonderland, by Lewis Carroll.
[8] Louisiana Constitution of 1974, Art. 1 § 7.
[9] This phrase is quoted from Judge Augustine's majority opinion in this case (upholding appellant's dismissal from the police force). Its language suggests that Bruno's sick leave problems simply represented a stroke of bad luck for him, free of any initiation by City officials lacking enthusiasm for his welfare. This theorywhich could be called the "open manhole" theory seems to suggest that there is no point in looking too closely behind the facts inasmuch as everything happens for the best (at least for those employees who know which side their bread is buttered on).
[10] U.S. Constitution, Amendment 1; Louisiana Constitution of 1974, Art. 1 § 7.
[11] Examples from the charges against Officer Bruno from Superintendent Parsons' letter of March 14, 1980. Transcript I.
[12] Pages 142-143, Transcript II.
[13] Pages 52-53, Transcript II.
[14] Page 44, Transcript II.
[15] Page 72, Transcript II.
[16] Page 75, Transcript II.
[17] Page 76, Transcript II.
[18] Page 77, Transcript II.
[19] Page 78, Transcript II.
[20] Officer Bruno, as the Police Department's personnel file showed, was retired from the National Guard active service in 1966 for a heart defect, the very same defect which has from time to time resulted in episodes of paroxysmal tachycardia which render Bruno temporarily disabled.
[21] Martin is Clyde P. Martin, Bruno's attorney at the Civil Service hearing. Parsons is Superintendent of Police James Parsons. This excerpt is from page 374-375 of Transcript III.
[22] Under the circumstances, this abrupt dismissal hardly meets the test of not being "arbitrary, capricious or discriminatory." See: Jones v. Louisiana Department of Highways, 259 La. 329, 250 So.2d 356, 359 (1971).