462 So.2d 139 (1985)
Vincent J. BRUNO
v.
DEPARTMENT OF POLICE.
No. 84-C-1294.
Supreme Court of Louisiana.
January 14, 1985.
Rehearing Denied February 21, 1985.
*140 John Levy, Laplace, John H. Brooks, Gretna, Frank DeSalvo, New Orleans, for applicant.
Salvador Anzelmo, City Atty., Bruce E. Naccari, Asst. City Atty., Bernette J. Johnson, Deputy City Atty., for defendants-respondents.
WATSON, Justice.
Plaintiff, Vincent J. Bruno, is contesting his discharge as a civil service employee of the New Orleans Police Department. After the Civil Service Commission upheld his dismissal, Bruno appealed to the Fourth Circuit Court of Appeal, which affirmed the Commission, with one judge dissenting.[1] A writ was granted to review the judgment.[2]
While serving as a police officer assigned to the Urban Squad, Bruno also held a union office, being president of the Policeman's Association of New Orleans (PANO). However, the reasons for his discharge outlined in the Superintendent's letter of termination dated March 14, 1980, were unrelated to Bruno's union activities. He was charged with:
(1) violation of ASOP 75.2,[3] relating to sick leave regulations;
(2) violation of Rule 4, paragraph 2,[4] in refusing to obey a lawful instruction to return to work; and
(3) violation of Civil Service Rule IX, *141 § 1.1[5] by being unable or unwilling to perform the duties of his position.
Bruno allegedly violated these regulations between October 21, 1979 and March 10, 1980.
The Civil Service Commission concluded that the City carried its burden of proving that Bruno did not report absences from his place of confinement and that the reasons for his absences were not those allowed by ASOP 75.2. The Commission did not deal with the charge of disobeying an order but did question whether Bruno was actually ill during the entire period from October 21, 1979 to March 14, 1980.
The Court of Appeal concluded that Bruno had violated D.R. 630-3, paragraph 9, as modified on October 25, 1978, by not receiving departmental permission through the chain of command for leaving his place of confinement.[6] However, violation of this regulation is not specified in the letter of termination which was sent to Bruno by Superintendent Parsons.
LSA-R.S. 33:2423 provides in pertinent part:
"In every case of removal or reduction in pay of any employee in a competitive position in the classified service or of involuntary retirement or demotion of the employee, the appointing authority shall furnish the employee and the director a statement in writing of the reasons therefor."
The Court of Appeal erred in affirming the Commission on the basis of Bruno's violation of a regulation of which Bruno was not notified in his letter of termination. See Department of Public Safety v. Rigsby, 401 So.2d 1017 (La.App. 1 Cir.1981), writ denied, 406 So.2d 626.
Review of the Commission's decision extends to both the law and facts. LSA-Const.1974, Art. X, § 12. The Commission's findings of fact should be given the same deference as those made by a judge or jury. Walters v. Dept. of Police of New Orleans, 454 So.2d 106 (La.,1984). Thus, the standard of review does not differ from that in other civil cases, and the Commission's determination should be affirmed unless it is manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.,1978).
The question is whether Bruno was validly discharged for violating ASOP 75.2. While this regulation was not enacted until November 4, 1979, while Bruno was on sick leave, Bruno stated that he was aware of ASOP 75.2.
At the Civil Service Commission hearing, Bruno essentially admitted that he did not work from October 21, 1979, until his discharge on March 14, 1980. His initial complaint on October 21 was an ear infection. *142 This diagnosis remained on record through November 28. On November 29, the diagnosis became prostate gland trouble and this illness is reflected on the Police Department's records until February 12, 1980, the last day Bruno is shown on sick leave. However, Bruno testified he also had a congenital "heart seizure problem" (Tr. 40).
Bruno admitted most of the activities enumerated in the letter of termination, to-wit: he went to Detroit on business around November 24, 1979; acted as a judge for a talent contest in Metairie on December 13, 1979; gave an interview at the WWL-TV studio on December 28, 1979; failed to meet an appointment with Sergeant Thompson on January 6, 1980; met the City's Chief Administrative Officer, Reynard J. Rochon, at the Warwick Hotel on January 12, 1980; gave an interview to Sally Ann Roberts of WWL-TV on January 16, 1980; addressed the Krewe of Endymion at the Fountain Bay Hotel on January 22, 1980; attended a PANO meeting on January 23, 1980; attended a fund raiser for President Carter at the Hilton Hotel on January 31, 1980; attended a PANO meeting on February 5, 1980; and gave an interview at the WDSU studio on February 29, 1980. Bruno also admitted a trip to New York on union business in March and periodic visits to Florida for union business and relaxation. He also went to Detroit, Philadelphia, and Cincinnati, Ohio, the last trip being on March 14, the date he was terminated. According to Bruno, he was not mentally or physically capable of doing street duty with a gun during the period that he was absent from work.
Bruno initially listed his place of confinement as "35 North Clareoning Avenue, Margate, New Jersey, outside Philadelphia" (Tr. 108). On November 11, 1979, his place of confinement was changed to a New Orleans address, 1721 Abadie Avenue. On January 6, 1980, Bruno's place of confinement became 237 Penfold Street, Harahan.
According to Sergeant Liniel W. Thompson, who was assigned to the Urban Squad and worked as Bruno's supervisor, Bruno did not report for an interview on January 6 at 10:30 P.M. and could not be reached by telephone. Subsequently, on January 8, Bruno told Thompson he had not reported to make a statement on the advice of his psychiatrist. Bruno testified that there was merely a misunderstanding about the appointment.
On January 20, 1980, Bruno requested Lieutenant Rinial Martin to place him on furlough instead of sick leave status. Martin advised that this would require Bruno to report to work. Bruno also called Deputy Chief David Kent about changing his sick leave status. Kent said he would not entertain an application for a furlough until Bruno returned to work because Bruno had abused his sick leave. Reynard J. Rochon testified that Bruno asked him to intercede and get him placed on retroactive annual leave. Bruno denied this. On February 1, 1980, Bruno's status was changed to "annual leavesick" (Tr. 81). Bruno was changed from sick leave to annual leave status because he had run out of sick leave.
Bruno was called in to give a statement on March 7 because he was not at home when policemen checked his house on November 30 and an investigation had been initiated. After a hearing, Superintendent of Police Parsons ordered that Bruno be taken for a physical examination. Bruno was examined by a physician at the Tulane Medical Center and pronounced fit for duty. Parsons then ordered Bruno to return to work. When he did not report the following Monday, March 10, Lieutenant Martin told Bruno he was ordering him back to work. Bruno advised that he had had a heart seizure on Saturday and had been taken to the hospital and Martin did not insist that Bruno report. Bruno had appeared on a radio talk show earlier that day. Lieutenant Martin was previously unaware that Bruno had any type of heart problem.
Sergeant Marion Coker testified that the practice of the Department for eight or nine years had been to require personnel on sick leave to be confined unless absent for a medical reason. When Sergeant Coker *143 had been on sick leave with a broken shoulder, he received special permission to leave his home after his doctor issued a letter which was approved by the Deputy Superintendent.
Dr. Harry H. Philibert, a specialist in family practice who operates the New Orleans Pain Clinic, testified that he had treated Bruno and was familiar with his medical situation. He first saw the patient on March 28, 1978, and has seen him periodically since that time. Bruno suffers from recurrent attacks of paroxysmal tachycardia, or rapid heart beats, which Dr. Philibert treated with medication.[7] On March 10, 1980, Dr. Philibert examined Bruno. Although his EKG showed a normal sinus rhythm, i.e. his heart was beating normally, an exercise test produced the onset of paroxysmal tachycardia. Medication was prescribed. According to Dr. Philibert, "Bruno ... can't play cops and robbers, ... I just don't think he can tolerate that stress." (Tr. 323) He can perform limited duty but his condition is potentially "lethal" (Tr. 325). According to Dr. Philibert, it would be easy for another physician in a routine examination to be unable to diagnosis Bruno's paroxysmal tachycardia because of the unpredictability of the condition.
James C. Parsons, Superintendent of the New Orleans Police Department, testified that he held a disciplinary hearing concerning Bruno on March 7, 1980, in regard to allegations that Bruno was violating the rules regarding sick leave. After Parsons ordered Bruno to go back to work, he was advised on March 10, 1980, that Bruno had not returned to work because of a heart seizure.[8]
Policeman Hubert J. Badeaux drove with Bruno to the radio talk show interview on March 10. During a subsequent lunch, Bruno received a call on his beeper, went to the phone and told Badeaux he had been ordered back to duty. Bruno then said he was going to his physician. According to Badeaux, Bruno had reported his absence from home to the police department on several occasions when Badeaux was with him.
Bruno said he had always called in when he left his residence and that this was regarded as compliance with the rule, but some of his testimony was evasive. According to Bruno, he was following his doctors' orders and the department's procedures and was never advised that he was in violation of the regulations. Although he was willing to perform his duties in a limited capacity, he was not permitted to do so and was told that anxiety or stress would bring on his tachycardia problem. Bruno said his heart seizure on March 8 was documented at East Jefferson Hospital and that he had another seizure on March 10. The Urban Squad patrolled the projects, very high crime rate areas, and he was unable to perform that duty. According to Bruno, Sergeant Liniel Thompson advised him on December 7, 1979, that his absences would be all right as long as he called and let someone know where he would be.
Captain Richard B. Martin, a twenty-two year veteran of the Police Department, testified that he was familiar with the sick leave regulations. He confirmed Bruno's testimony that when someone called to say he was leaving his residence, a notation would be made on a slip of paper which was discarded when the caller returned home.
In a statement given to Sergeant Thompson on December 7, 1979, Bruno admitted to being familiar with New Orleans Police Department ASOP 75.2, supra. (Joint Exhibit, No. 2) In regard to his alleged misconduct on November 30 in not being home, Bruno said he had visited two doctors and his druggist. He twice received a busy signal when he attempted to notify the Urban Squad office and had then called the Health Services Section.
*144 Bruno argues that there was no legal cause for his termination; that discharge is too severe a penalty for violation of the sick leave regulations; that the regulations restricting those on sick leave to a place of confinement violate fundamental constitutional rights; and that the regulation in question was enforced against him in a discriminatory manner.
The record leaves some question about whether Bruno reported absences from his place of confinement. However, the Commission was not clearly wrong in finding that the Department carried its burden of proving that Bruno was not reporting those absences. There is no question, as the Commission found, that all of Bruno's absences from his place of confinement were not for the specified purposes allowed by the sick leave regulation.
In view of the period of time involved and the flagrant nature of Bruno's violations, termination cannot be classified as too severe a penalty. It is clear that his misconduct must have had a real and substantial relationship to the efficient operation of the service. Newman v. Department of Fire, 425 So.2d 753 (La.,1983).
The constitutionality of the provision restricting those on sick leave to confinement presents a serious question. The Seventh Circuit Federal Court of Appeals held in Pienta v. Village of Schaumburg, Ill., 710 F.2d 1258 (1983) that a similar provision infringed on the fundamental constitutional rights to vote, attend church, go to court, attend political or family gatherings and travel. Pienta concluded that such a stringent regulation could only be justified by a compelling state interest. The Police Department's interests in avoiding abuse of sick leave, protecting the public fisc, efficiently allocating man power, requiring those on leave to stay by the phone in case they are needed, and maintaining the morale of those serving did not suffice, because they could be achieved without such a blanket restriction on freedom of movement. On rehearing, the majority in the Court of Appeal analyzed the applicability of Pienta to this situation and concluded that its strict scrutiny analysis was not appropriate. Such rules are not per se arbitrary and irrational and can be enforced unless, as applied, they unreasonably restrict constitutional rights. See Cacace v. Seniuk, 104 Misc.2d 560, 428 N.Y. S.2d 819 (1980).
The Pienta plaintiffs sought a declaratory judgment and an injunction against enforcement of the confinement regulations. Bruno, however, did not challenge this regulationuntil his discharge was under consideration in the Court of Appeal. His only complaints concerning constitutionality are made now retroactively, and there is no showing of a deprivation of rights. In considering his good faith as an employee, it is significant that Bruno did not attempt compliance with the Department's regulations for extended sick leave. D.R. 630-3, paragraph 9, as amended on October 25, 1978. See Footnote 6, supra.[9]
Although Bruno was advised by his physician that he could undertake certain outside activities, he never attempted to obtain departmental permission for those endeavors. *145 Had Bruno unsuccessfully sought permission for appropriate activity during his rehabilitation, he could then legitimately raise the constitutional issue of the overbreadth of ASOP 75.2. See Loughran v. Codd, 432 F.Supp. 259 (1976). Bruno chose, instead, to completely disregard the regulations of the Police Department even after he had been advised that his conduct was under investigation.
It is suspicious that Bruno's heart condition did not surface until he was actually ordered to return to work. While there was testimony that outside activities which were not stressful were compatible with that condition, there was no evidence those activities were compatible with the stated reasons for his sick leave, to-wit: an ear infection and prostate trouble.
There is no evidence that Bruno was singled out for disciplinary action on a discriminatory basis.
While the regulation may present serious constitutional problems in other contexts, Bruno's flagrant violations over a period of almost five months were prejudicial to the conduct of the New Orleans Police Department and justified his discharge. As applied to Bruno, the regulation did not arbitrarily or unreasonably restrict his constitutional rights.
For the foregoing reasons, the judgment of the Court of Appeal is affirmed. AFFIRMED.
MARCUS, J., dissents.
CALOGERO, J., dissents. Dismissal of relator from this Department is a patently excessive disciplinary penalty, in my opinion.
NOTES
[1] Bruno v. Department of Police, 451 So.2d 1082 (La.App. 4 Cir.1984).
[2] 457 So.2d 1184 (La.,1984).
[3] "A sick leave period commences at the time the member notifies the Desk Officer. A member on sick leave shall remain in his residence or other approved place of confinement for the entire sick leave period, except to visit a physician, hospital, clinic, purchase meals or purchase medicine. The member shall notify his Unit of assignment before leaving and upon returning from such a visit (exceptions below). If the member is assigned to a unit that is not open on a 24 hour basis, notification shall be made by telephone to Health Services Section or that section's Code-A-Phone." (Appellant Exhibit A)
[4] "A member shall professionally, promptly, and fully abide by or execute instructions issued from any authoritative source. If the instructions are reasonably believed to be in conflict with the Rules and Procedures of the Department or other issued instructions, this fact shall respectfully be made known to the issuing authority. If the issuing authority elects to insist upon execution of the instructions which are reasonably believed to be in conflict with Department Rules and Procedures, then the member receiving the instructions shall have the right to request and is entitled to receive, IMMEDIATELY, said instructions in writing, except as determined by the supervisor. The issuing authority shall be held responsible should any conflict materialize; however, no instructions shall be issued or executed which are in violation of law." (Appellant Exhibit A)
[5] "Section 1. MAINTAINING STANDARDS OF SERVICE 1.1 When any regular employee in the classified service is unable or unwilling to perform the duties of his position in a satisfactory manner or has committed any act to the prejudice of the service, or has omitted to perform any act that it was his duty to perform, or otherwise has become subject to corrective action, the appointing authority shall take action warranted by the circumstances to maintain the standards of effective service. The action may extend to (1) removal from the service, (2) retirement, (3) reduction in pay to the next lower rate in the range for the class, (4) demotion to any position of a lower class that the employee is deemed by the appointing authority and the Director to be competent to fill, (5) suspension without pay not exceeding in the aggregate one hundred twenty (120) days in any period of twelve (12) consecutive calendar months, (6) fine. (as amended February 9, 1955 and August 9, 1979)." (Appellant Exhibit A)
[6] D.R. 630-3, paragraph 9, formerly provided:

"Employees on extended sick leave, for an illness or any injury, may arrange for advance approval from the Medical Section for activities related to continued treatment, convalescence and rehabilitation so that notification of each instances of leaving the place of confinement will not be necessary."
On October 25, 1978, this regulation was modified to state:
"An employee who has permission from his attending physician to leave his place of confinement shall secure departmental permission through the chain of command from the Superintendent or Deputy Superintendent of Police. Such request must be secured prior to the employee actually leaving his place of confinement."
Bruno testified that he was unaware of the amendment promulgated on October 25, 1978.
[7] Bruno said he had received a medical discharge from the military on April 17, 1967, because of this condition.
[8] Dr. Philibert's testimony establishes justification for Bruno's refusal to obey Parsons' order to return to work.
[9] After a revision on November 4, 1979, the extended sick leave provision was as follows:

"ASOP 75.12: EXTENDED SICK LEAVE Members on extended sick leave for illness or injury (including IOD) may arrange for advance approval for activities related to continued treatment, convalescence and rehabilitation in the following manner, so that notification is not necessary:
"a. written request must be made to the respective Bureau Chief, via the Chain of Command. Basis for this request must be clearly stated and must be accompanied with a letter from the individual's attending physician, stating the necessity for his request and an approximate duration of treatment, convalescence or rehabilitation.
"b. The Commanding Officer of the individual making the request must review this request recommending approval or disapproval, and forward same to the respective Bureau Chief.
"c. All approvals will be for a maximum of 14 days (unless waived by the Bureau Chief). At the end of each 14 day period, the case shall be re-evaluated by the individual's Commanding Officer and submitted to the Bureau Chief before any extension is granted for the additional time."